Otto T. Mallery and Louise Mallery v. Commissioner. Otto T. Mallery v. Commissioner.
Mallery v. Commissioner
Docket Nos. 108606, 108605.
United States Tax Court
1943 Tax Ct. Memo LEXIS 362; 1 T.C.M. (CCH) 891; T.C.M. (RIA) 43169; April 13, 1943
*362 Peter V. D. Voorhees, Esq., 20 Exchange Place, New York City, Samuel B. Stewart, Jr., Esq., and Howard H. Yocum, Esq., for the petitioners. Paul E. Waring, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax against petitioners in docket No. 108606 in the sum of $5,031.67 for the calendar year 1935 and against petitioner, Otto T. Mallery, in docket No. 108605, in the sum of $1,982.34 for the calendar year 1936. A loss on certain Bayshore Company preferred stock is claimed in each docket number; so if the loss is allowed for one of the two years its allowance for the other is automatically precluded. Petitioners claim an overpayment for the year 1935 in the amount of $8,452.87 in the event we decide both (a) that certain Bayshore Company preferred stock owned by Otto T. Mallery became worthless in that year and (b) that a certain indebtedness to Otto T. Mallery evidenced by a certificate of beneficial interest issued by the Costilla Trust became worthless and was so ascertained to be and charged off by Otto T. Mallery in that year. The first issue is whether or not petitioners are entitled to a $25,000 bad debt *363 deduction from gross income for the year 1935 in connection with a first lien certificate of beneficial interest in the Costilla Trust. The second issue concerns the year in which Bayshore Company preferred stock became worthless. The proceedings are consolidated. Findings of Fact Petitioners are husband and wife residing in Philadelphia, Pennsylvania. They filed a joint return for the calendar year 1935 with the collector of internal revenue for the First District of Pennsylvania. Petitioner, Otto T. Mallery (hereinafter referred to as Mallery), filed an individual return for the calendar year 1936 with the same collector. On November 14, 1908, the Costilla Estates Development Company (hereinafter referred to as the Development Company) was incorporated under the laws of Nevada for the purpose of acquiring approximately a half million acres of land in the San Luis valley, partly in Colorado and partly in New Mexico, and of developing the land as farming and grazing tracts with an irrigation system, railroad, and three towns. During the period from 1908 to 1920 Mallery made substantial investments in Series A and Series B bonds of the Development Company which are not here involved. *364 During part of this time he was a director of the Development Company. On July 21, 1921, pursuant to a plan proposed by a protective committee for bondholders of the Development Company for the purposes of raising new money and of avoiding foreclosure proceedings and expenses incident to receivership, the Costilla Trust (hereinafter referred to as the Trust) was created to become the beneficial owner of all the stock and all the Series A and B bonds of the Development Company. Security holders of the Development Company transferred their holdings therein to the trustees under the Trust and also contributed new money to the Trust. In exchange for the new money so contributed the trustees issued five percent first lien certificates to the contributors in an amount of twice the amount of the money contributed. In accordance with the plan Mallery contributed $25,000 of new money for which he received first lien certificate of beneficial interest of the Costilla Trust (hereinafter referred to as the Certificate), dated November 25, 1921, in the face amount of $50,000. The following statement appeared on the face of the Certificate: THIS CERTIFIES that * * * OTTO T. MALLERY * * * is *365 entitled, in respect of moneys advanced in aid of the consummation of the Plan proposed in Circular of said Hughes et al. Committee dated May 31st, 1921, to receive from the Trustees under said Declaration, as and when cash realization upon the trust assets shall have become such that the Trustees are able, and consider it expedient to distribute the same, the sum of * * * FIFTY THOUSAND * * * Dollars $50,000.00 * * *) with interest at the rate of five (5) per cent per anunm reckoned from the first day of July, 1921. In 1923, in order to avoid the high interest rate and pressing maturities of temporary loans, the trustees of the Trust arranged for a $100,000 bond issue on Colorado lands of the Development Company, secured by a mortgage dated May 1, 1923 having priority over all other liens on such lands. In 1924 Mallery purchased a bond in the face amount of $1,000 out of that issue. From 1921 to 1934, inclusive, the Development Company sustained operating losses in excess of $140,000 during each of such years and in 1935 a loss of $85,611.65. These losses were due principally to deductions of interest accrued on bonds of the Development Company which during all those years were *366 held by the Trust and none of which interest had been paid. The total of these operating losses was $2,675,449.37. In October 1932 the trustees issued a report to the holders of its certificates and obligations in which it was stated inter alia: that the $100,000 bond issue on the Colorado lands secured by the mortgage of May 1, 1923 and interest thereon in the amount of $11,000 was overdue; that there were outstanding tax sales certificates on certain real estate of the Costilla Estates Development Company in the amount of nearly $70,000; that there were also outstanding unpaid taxes on certain other of such lands in the amount of over $70,000 with interest and penalties thereon; that if the tax sales certificates were not paid the holders would have to assert the lien of the certificates against the real estate; and that the taxes must be paid or settled in order to preserve the trust property. The report stated further that the matured and unpaid bonds and the outstanding tax sales certificates and unpaid taxes constituted a menace to all the assets of the Trust; and that it was apparent that only the raising of additional funds to pay the matured bonds, tax certificates, *367 unpaid taxes, future taxes, and operating deficits could save anything out of the Trust properties. The report stated further that if $100,000 could be raised for use in paying unpaid taxes and tax sales certificates it was the expectation of the trustees that an arrangement could be made with the bond holders as to past due bonds. The report further stated that to raise the funds required the formation of a new corporation was contemplated and that in case of failure to secure sufficient stock subscriptions there would have to be a complete liquidation of all the Trust assets, probably through a receivership in which event "all interests in the Trust would be of doubtful or diminished or no value". The report urged all beneficiaries under the Trust to subscribe stock in the suggested new corporation. No new corporation was formed as contemplated by the report until the Costilla Land Company was organized, as hereinafter shown, on December 1, 1934. From 1932 to 1935 Mallery kept in touch with the situation regarding his investment in Costilla Estates Development Company and the Costilla Trust only through letters and reports of the trustees received by him. From the time of receiving *368 the October 1932 report Mallery failed to make any further investment in the Trust or the Development Company or in any proposed new company; but in the early part of 1935 considered the matter of investing in the proposed new company but gave up the idea when another holder of the Trust certificates declined to join him in engaging an expert on Western land values to investigate the value of their investments in the Trust. The trustees received no additional funds as a result of this October 1932 report, except that persons friendly to the Trust, including two of the trustees, formed a syndicate which put up $17,500. This sum was used to purchase tax sale certificates on Colorado lands and to pay taxes on approximately 30,000 acres of New Mexico grazing lands. Up to January 31, 1935, neither the trustees nor the Development Company had the funds with which to repay the syndicate the $17,500 and take over the tax liens acquired by it. Mallery received a report from the trustees, dated January 31, 1935, which stated, inter alia, that on December 1, 1934, a new company, the Costilla Land Company, had been organized under the laws of Nevada and that the trustees expected to cause *369 the Development Company to transfer all its assets to the new company. Beneficiaries under the Trust, including Mallery, were to be given the privilege of buying stock in the new company at par. Mallery received another report from the trustees, dated August 23, 1935, stating that the trustees had caused the Development Company to turn over all its properties to the Costilla Land Company and that stock was being issued to persons who provided the necessary capital to protect the property. This report also stated, in part, as follows: The Trust has no other property or assets and accordingly the Trust has now been completely terminated. All Trust Obligations and Certificates issued under the Declaration of Trust dated July 21, 1921, are without any value. Upon receipt of the August 23, 1935 report, Mallery wrote a pencil notation to his secretary, Miss Vail, on the upper right-hand corner of the report, saying: "Vail - claim loss in income tax". He also drew a circle around the part of the report which stated that these certificates were "without any value" and a line from the circle to the notation as an indication to his secretary that the loss on his certificate was to be claimed *370 on his income tax return. At the same time he made a mental charge-off of the certificate as worthless. Mallery did not keep a formal set of books or records of investments in 1935 and the practice which he followed of making the notation to his secretary instructing her to claim the loss on his income tax return was his normal method of charging off a loss. Petitioners filed joint income tax returns for the years 1932 and 1933 reporting net losses of $50,000 and $48,000, respectively, and showing no tax payable. In April 1936 petitioners filed a joint income tax return for the year 1935 with the word "tentative" typed on it. No deduction was taken in that return with respect to the certificate owned by Mallery because he did not have complete information as to the total amount which he thought might be deductible by reason of the total loss on his investment in the Costilla Trust and his A and B Bonds of the Development Company. Because of his uncertainty as to the total loss which might be claimed he took no deduction on his original return, but marked the return "tentative" with the intention of claiming the full amount of his loss when he had ascertained it. By letter dated *371 September 14, 1936, Mallery wrote to the collector of internal revenue, Philadelphia, informing him of the Costilla loss of $25,000 and explaining that when making his 1935 tentative return he had been unable to get complete information as to his total loss. In reply to this letter the collector requested Mallery to prepare and execute an amended return. Mallery complied with this request by filing such return. The original return marked "tentative" showed capital gains on securities held over ten years of $5,975.44. The amended return showed capital losses on securities held over ten years of $19,024.56. The difference of $25,000 represented the inclusion in the amended return of the Costilla loss to the extent of the investment in the first lien certificate. In filing the amended return Mallery erroneously limited the $25,000 Costilla loss to thirty percent thereof because he was under the mistaken impression that the loss had to be treated as a capital loss. In his determination of the deficiency respondent disallowed the $25,000 deduction on the ground that petitioners had not made a satisfactory showing that the certificate had become worthless during 1935 and that there had *372 not been a charge-off in that year. Mallery's certificate became worthless in 1935; should have been and was so ascertained by him; and was charged-off by him in that year. On August 24, 1938, petitioners in docket No. 108606 filed a claim for refund for the year 1935 in the amount of $8,531.50. The dates of certain of their payments on income tax for 1935 and the amounts thereof are as follows: $3,426.45 on September 18, 1936; $2,764.36 on October 6, 1936; and $2,340.69 on April 12, 1937. During the period from December 4, 1925 to January 16, 1927, Mallery purchased 50 shares of the preferred stock of the Bayshore Company at a total cost of $5,250, a certificate for same being issued October 8, 1928. He remained owner of this stock through 1936. Mallery's investment in the preferred stock was a long term speculative investment which depended for its success upon the growth and development of Jacksonville, Florida. The Bayshore Company was incorporated in 1925 under the laws of Florida for the purpose of acquiring a large body of land near Jacksonville, Florida; for the construction of a toll road through this property along the north shore of the St. Johns River to a terminus *373 near the mouth of the river and the Atlantic Ocean; and to offer the property for sale for residential, industrial, and beach development. From its organization to May 31, 1928 the Bayshore Company issued its preferred stock in the amount of $2,038,500, from the proceeds of which and from other sources it expended $556,300 for 17,000 acres of land and their development; $1,088,000 for the toll road and other construction; and $39,700 for equipment, furniture, fixtures, and deferred charges. In 1928 the Bayshore Company issued ten year 8 percent debenture gold bonds in the face amount of $700,000 to pay off its current and mortgage indebtedness and leave a working capital of $232,000 for an extension of the toll road and other improvements. As of May 31, 1928 the Bayshore Company had no liabilities except the $700,000 of outstanding 8 percent debenture gold bonds and its capital surplus at that time was estimated to be $232,280.86. During 1928 the real estate holdings of the Bayshore Company were appraised by the Jacksonville Realty Board, who assigned a sound present value to the lands of $2,547,651. This appraisal figure was carried on the balance sheet as of May 31, 1928 of the *374 Bayshore Company as the value of the land. The toll road was carried on the balance sheet at $1,531,391 as cost of its construction plus value of right-of-way. The total fixed assets of the company, as shown by the balance sheet, including an office building leasehold at $56,974.11 exceeded $4,000,000. In accordance with an option contained in its bond indenture, the Bayshore Company during the period from March 15, 1929 to March 15, 1932 paid $56,000 interest per annum arising on its bond indebtedness in scrip. On May 1, 1931, the Bayshore Company leased an office building in Jacksonville, Florida from the Southeastern Investment Company for a term of nine years and eight months for a total rental of $116,000, payable at the rate of $1,000 a month. On September 15, 1932, the Bayshore Company defaulted in the payment of interest on its outstanding $700,000 of ten year 8 percent debenture gold bonds and has paid no interest since that time. On December 1, 1932, it defaulted under the terms of its lease with the Southeastern Investment Company. In February 1933, pursuant to an action by the trustee on the bond indenture securing the payment of the $700,000 of bonds instituted in *375 the United States District Court for the Southern District of Florida, a receiver was appointed by the court to take over all of the company's property and he continued to operate the property through November 1936. In February 1933 the Southeastern Investment Company intervened in the receivership proceeding asserting damages for breach of the lease. On February 27, 1933, the receiver gave notice to the Southeastern Investment Company that he had elected to disaffirm and reject the lease. On March 30, 1935, a special master's report in the receivership proceedings awarded damages to the Southeastern Investment Company in the amount of $53,475. Of this amount $34,575, representing damages from April 1, 1935 through December 31, 1939, was to be reduced to its present cash value as of the date of the report. The report awarded to the Southeastern Investment Company the further amount of 10 percent of the total amount of its damages. This report was confirmed by the court on October 29, 1935. In February 1933 a committee was formed to protect the interest of the bondholders of the Bayshore Company. From 1932 to 1936, inclusive, the Bayshore Company had gross income of $10,914.39, *376 $5,048.79, $8,798.54, $8,785, and $5,542.29, respectively, as shown on its income tax returns. Its net losses also so shown for the same years were $235,725.18, $15,741.85, $107.08, $3,819.84, and $65,815.18, respectively. The Bayshore Company continued until 1936 to own substantially all of the assets which it had ever acquired. The consolidated balance sheet as of May 31, 1936 of the Bayshore Company and the Bayshore Water & Light Company, a small wholly owned subsidiary, and an analysis of the assets and liabilities of the two companies, both by the receiver, showed the Bayshore Company to have outstanding capital stock in the amount of $3,519,465.67, of which amount $2,019,466.67 represented preferred stock; total assets of $3,569,698.92; total liabilities, not including capital stock, of $941,730.60; and a deficit of approximately $891,000 including capital stock as a liability. From this balance sheet and analysis there was erroneously omitted as a liability the amount of $196,000 interest due on the bonds from September 15, 1932 to March 15, 1935, inclusive, which increased the deficit shown on the balance sheet and analysis by such amount. By August 24, 1936 all of the major *377 claims against the Bayshore Company, except its obligations to its security holders, had been disposed of or adjusted. On that date, the court gave judgment for the trustee in its action on the bond indenture in the sum of $1,120,000, plus interest, and ordered all of the property of the Bayshore Company to be sold. Such sale was made on October 5, 1936, at a public auction, and the bondholders' protective committee bid in such property for $300,000, subject to the approval of the court. On November 17, 1936, the court tentatively approved a plan of reorganization filed by the bondholders' committee dated November 10, 1936, as well as the sale for $300,000 subject to the right of any debenture holder or other creditor whose claim had been allowed by the final decree entered by the court or by any preferred stockholder of the Bayshore Company to file written objections thereto with the court on or before December 4, 1936, the objections, if any, to be considered at a hearing on December 7, 1936. The plan of reorganization, tentatively approved by the court on November 17, 1936, contained the following provisions relative to the preferred stock of the Bayshore Company: The debenture *378 holders have recovered judgment for the sum of $1,120,000 and interest, making the total obligation of the Company to them $1,287,377.70. The only bids at the sale, with the exception of the Committee's bid of $300,000, were scattered bids of small amounts for isolated portions of the property. In view of these facts the Committee feels that there is no possible equity in the preferred or common stock of the Company and this stock has therefore been disregarded in this Plan with one exception hereinafter noted. * * * * * * * *
Each holder of the preferred stock of the old Company is to receive the right to subscribe to the Series A mortgage bonds [of a proposed new corporation] to the extent of 1% of the par value of his old holdings, or a total for all preferred stockholders of $20,288, with the right to over-subscribe and be allotted any portion of said Series A mortgage bonds not subscribed for by debenture holders or other preferred stockholders. In addition, each present preferred stockholder exercising such right will receive 25 shares of the $1 par value common stock of the new corporation for each $1,000 subscribed. [Brackets ours.] No objections were filed to either the *379 sale or the plan of reorganization and the hearing was continued from December 7 to December 14, 1936 in order for the bondholders' committee to make good their bid of $300,000 for the properties of the Bayshore Company. On December 14, 1936, the committee had failed to make good their bid and consequently to consummate the plan of reorganization, but, instead, filed on that date, an amendment to the original plan of reorganization. The amendment contained this provision concerning the preferred stock: Each holder of the old preferred stock of the old Company is to receive the right to subscribe to the new mortgage bonds of the new Company to the extent of 1% of the par value of his old holdings with the right to over-subscribe and be allotted any portion of said new mortgage bonds not subscribed for by the old debenture holders or other preferred stockholders. Each holder of the old preferred stock of the old Company so subscribing to the new mortgage bonds of the new Company is to receive new mortgage bonds of the new Company to the face amount of his subscription plus 25 shares of the new common stock of the new Company for each $1,000 subscribed. On December 14, 1936, the court *380 ordered that the matter be continued until January 11, 1937 at which time the bondholders' committee was to produce in open court in cash, or by certified check, the funds necessary to carry out their bid and the proposed amended plan of reorganization. Mallery in his 1936 income tax return reported $5,136.41 as a capital loss on his Bayshore Company preferred stock erroneously claiming such loss to the extent of thirty percent thereof, or $1,540.02. Respondent disallowed this loss in his notice of deficiency. The Bayshore Company's preferred stock, including that of petitioner, became worthless in 1936. Opinion TYSON, Judge: The first issue is whether or not petitioners are entitled to a deduction of $25,000 as a bad debt for the year 1935 by reason of the worthlessness of the Trust certificate held by Mallery. Petitioners contend that the certificate became worthless in 1935. Respondent contends that it became worthless or reasonably should have been ascertained to have become worthless prior to that year, and more specifically in 1932, and that the loss was not charged off in 1935 by petitioners as required by section 23 (k) of the Revenue Act of 1934. [1]
*381 In determining whether a taxpayer has ascertained a debt to be worthless the courts differ in the test to be applied. Some say the test is an objective one; that is, the proper year for deducting a bad debt is the year in which the taxpayer, as a reasonably prudent person, should have ascertained the debt to be worthless. Others apply the subjective test, namely, the proper year for such deduction is that in which the taxpayer himself actually ascertained the debt to be worthless. See . In the case at bar we think that in applying either test petitioners have met the requirements of the statute as to ascertainment. The strongest support for a contention made by respondent, that petitioner as a reasonably prudent person should have ascertained the certificate to be worthless prior to 1935, is found in the report of the trustees of the Costilla Trust, in October 1932, to the certificate holders. That report, in effect, stated that unless additional funds were raised to pay the matured first mortgage bonds, overdue taxes, tax sales certificates, and operating deficits, the Trust assets would have to be liquidated, *382 probably through a receivership, in which event all interests in the Trust would be of "doubtful or diminished or no value". Respondent points to petitioner's failure to invest any more funds in the enterprise after receiving this report as indicating that petitioner did ascertain, or should have ascertained, the certificate to have become worthless prior to 1935 and more specifically in 1932. While it is true that the report of October 1932 painted a pessimistic picture we do not believe that it indicates that the Trust certificates were then entirely worthless. In fact, the report was issued in an effort to save valuable properties which still remained as security for the certificates; and this being true it could not be said that the certificates then had no value. Nor do we think the fact that petitioner failed to invest new money in the enterprise an indication that he had ascertained the certificate to be presently worthless. He might reasonably have considered the enterprise to have such poor future prospects as not to warrant the risk of losing additional funds and yet believed his certificate then had value. Neither are the large operating losses suffered by the Development *383 Company of vital significance for the reason that such losses were due, to a large extent, to the accrual of interest on the bonds of the Development Company held by the Trust. Such losses did not result in an actual decrease in the assets securing the certificate, but merely increased the indebtedness to the certificate holders. In view of the fact that the Development Company continued its existence under its own management until 1935, we think that Mallery was justified in considering his certificate of some value until 1935 when he received notice from the trustees specifically stating that it had no value. It was in that year when all the assets securing the Trust certificates were turned over to a new company and, therefore, in that year when Mallery could point to a specific identifiable event establishing the worthlessness of his certificate. Accordingly, we have found as a fact, and so sold, that Mallery's certificate became worthless and was properly ascertained to be worthless in 1935. In addition to ascertainment of worthlessness petitioners must also show that Mallery made a charge-off of the debt represented by the certificate in 1935. The record shows that Mallery *384 kept no books, but that upon receipt of the notice from the trustees that the Trust certificates were worthless he penciled thereon a notation to his secretary to the effect she was to claim a loss on the certificate in his income tax return. At the same time he also made a mental charge-off of the worthless certificate. We think the notation and instruction to his secretary as well as the mental charge-off sufficiently complied with the applicable statute. See ; ; and . Neither does the fact that petitioners did not claim the deduction on the original "tentative" return preclude them from being entitled to the deduction. Cf. Petitioners indicated their intention of filing another return for the year 1935 by marking the original return "tentative". Respondent later permitted them to file an amended return on which the petitioners erroneously deducted as a capital loss only thirty percent of Mallery's loss on the certificate. Such *385 characterization does not prevent petitioners, under the circumstances of this case, receiving the benefit of a bad debt deduction if entitled to same. Mallery properly charged off the loss on his certificate as having occurred in 1935. We conclude that petitioners are entitled to a bad debt deduction from their gross income in 1935 in the amount of $25,000, the cost of the Trust certificate to Mallery. The second issue is whether the Bayshore Company preferred stock owned by Mallery became worthless in 1935 or 1936 or prior to those years. Petitioners contend that it became worthless in one of those years and respondent contends that petitioner has failed to sustain the burden of proof that the stock became worthless in either year. In what year Mallery's stock became worthless is a question of fact to be determined from identifiable events evidencing present worthlessness as opposed to imminence of worthlessness. ; . On the second issue it is our opinion that the record establishes *386 that the Bayshore Company stock became worthless in 1936 and we have so found as a fact. At the outset it should be borne in mind that the venture for which the Bayshore Company was organized and in which it engaged was speculative. It was a real estate development company whose success depended on the growth of Jacksonville, Florida. Thus there was always the potentiality, so long as the company owned its extensive real estate holdings including the toll road, that it might realize large profits from the operations and sale of such holdings. In 1928 the value of these holdings was written on the company's books to a sound value as determined by the Jacksonville Realty Board. These assets were practically the same in 1936 as they were in 1928. The value was written on the company's books after the termination of the Florida real estate boom; so that it is reasonable to assume that such value did not change materially thereafter. It is true that the company had operating deficits which prevented it from meeting its obligations as they matured and that this occasioned the receivership proceedings and the company's eventual downfall. Nevertheless, these deficits far from reduced the *387 book value of the company's assets to below its liabilities. Even as late as March 31, 1936 the balance sheet prepared by the receiver showed the company to have assets exceeding liabilities, exclusive of capital stock, of approximately $2,627,968.32. So even including the liability of $196,000 for interest on bonds, omitted from this balance sheet, the company had assets exceeding liabilities of approximately $2,431,968.32. The fact that the Bayshore Company went into receivership in 1933 does not establish that Mallery's stock was worthless in that year. The receivership was obviously caused by reason of the company's inability to meet its liabilities as they matured. The mere fact of the establishment of a receivership and its continuation does not establish worthlessness. ; ; ; and . Here, although the corporation went into receivership in 1933 it continued at least until in 1936 to operate its business and to retain *388 nearly all of its real estate holdings. Also, as stated above, the balance sheet after receivership showed the company to have assets of a value much in excess of its liabilities exclusive of capital stock. Under these circumstances we cannot say that receivership was the identifiable event which determined Mallery's stock to be worthless. Cf. ; ; and The identifiable events which we believe establish the worthlessness of the Bayshore Company preferred stock were: first, the sale of all of the company's property on October 5, 1936 for $300,000 at open bidding in a public auction upon a judgment rendered by the court on August 24, 1936 in favor of the bondholders in the sum of $1,120,000 plus interest, or a total of $1,287,377.70, which judgment, together with that in favor of the Southeastern Investment Company, it was necessary to satisfy through a judicial sale of all of Bayshore Company's assets before any realization could be had on that company's preferred or common stock; and second, the plan *389 of reorganization proposed by the bondholders' committee and tentatively approved by the court on November 17, 1936 wherein the facts concerning such judgment and sale were set forth, followed by a statement that "In view of these facts the Committee feels that there is no possible equity in the preferred or common stock of the Company". Upon the happening of these two events in 1936 any possibility of preferred stockholders in Bayshore Company realizing on their stock vanished. Westly V. E. Terhune, supra; It is true that the sale of all the property of Bayshore Company for $300,000 was not confirmed by the court in 1936, but it is shown that no interested party filed objections to such confirmation after being duly notified to do so if they had objections and the reason for the court's not so confirming the sale, as indicated in the court's orders, was not because of the inadequacy of the bid but was because the bondholders' committee purchasing the property failed to produce the necessary funds to comply with its bid. The judicial sale at open competitive public bidding, even though but tentatively confirmed in 1936 by *390 the court, conclusively indicates, in our opinion, that thereafter there remained no possibility of obtaining at a further judicial sale, which would have been necessary if the bid of $300,000 was not finally confirmed by the court, an amount in excess of the judgments against Bayshore Company so as to leave any value in its preferred stock. The fact that the bondholders' committee had been unable to obtain the necessary funds to comply with its bid by the end of 1936 is further evidence of the worthlessness of the preferred stock of Bayshore Company in that year for it indicates that the bid price for the property might have been too high. Accordingly, we have found as a fact, and so hold, that Mallery's preferred stock in the Bayshore Company became worthless in 1936 and that he is entitled to a deduction from gross income for that year of the full amount of such loss. As stated in the opening paragraph, this holding automatically precludes the allowance of the deduction for the same loss in 1935. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (k) BAD DEBTS. - Debts ascertained to be worthless and charged off within the taxable year * * *↩